T.C. Memo. 2005-285

UNITED STATES TAX COURT

SOUTH COMMUNITY ASSOCIATION, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10959-03X.          Filed December 14, 2005.

<u>Roger J. Makley</u>, <u>Lance A. Gildner</u>, and <u>John T. Ernest</u>,[1] for
petitioner.

<u>William I. Miller</u> and <u>Linda C. Grobe</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, <u>Judge</u>:  Respondent determined that petitioner is not

exempt from Federal income tax under section 501(c)(3) and

_____

[1] John T. Ernest entered an appearance for petitioner on
Jan. 27, 2004, and withdrew as petitioner's counsel on June 4,
2004.

revoked petitioner's tax-exempt status effective January 1, 1992.[2] Petitioner has exhausted its administrative remedies and has petitioned this Court to declare its qualification for tax-exempt status under section 501(c)(3). See sec. 7428; see also Rule 211(a), (b), (g). Following the parties' filing with the Court of the administrative record underlying respondent's determination, the Court's granting of the parties' joint motion to calendar this case for trial, and the conclusion of the ensuing trial, we decide whether respondent properly revoked petitioner's tax-exempt status under section 501(c)(3). We hold that respondent did.

FINDINGS OF FACT

Some facts were stipulated and are so found. We incorporate herein by this reference the parties' stipulations of fact and the exhibits submitted therewith. Petitioner is an association that was formed by Larry Parr (Parr) on June 17, 1979. When its petition for declaratory judgment was filed, petitioner's principal place of business was in Middletown, Ohio.

On August 3, 1982, respondent determined that petitioner was a section 501(c)(3) organization exempt from Federal income tax. The determination was effective as of the day of petitioner's formation. At the time of this determination, petitioner did not

[2] Section references are to the applicable versions of the Internal Revenue Code, Rule references are to the Tax Court Rules of Practice and Procedure, and dollar amounts are rounded.

conduct any gaming activity. According to its bylaws, petitioner's exempt purpose was (and is) to provide aid for all forms of education. At some time between August 3, 1982, and January 1, 1992, petitioner began a gaming operation (gaming operation). The gaming operation was the idea of Parr, who during the relevant years did not work for petitioner but whose company sold to petitioner the supplies that petitioner used in the gaming operation.

From 1992 until 1995, the years audited by respondent in connection with his determination revoking petitioner's exemption, petitioner contributed $1,423,729 to various charities generally for the purposes of starting educational programs, building a school, and transporting handicapped individuals to various schools. Petitioner's contributions during the respective years were $440,055, $323,088, $386,599, and $273,987. Many of the recipients of these contributions were charities controlled by petitioner's president, James Clausing (Clausing). Petitioner funded its contributions almost entirely through its gaming operation.

Petitioner's gaming operation consisted of its sale of bingo cards and instant pull-tab tickets.[3] Petitioner sold its bingo

---

[3] Each of petitioner's instant pull-tab tickets was a paper ticket with a covered symbol. Upon purchasing an instant pull-tab ticket and uncovering the symbol, the purchaser won a prize if the symbol was one that was predesignated to win.

(continued...)

cards and instant pull-tab tickets at bingo games that petitioner held at a bingo hall in Middletown, Ohio, from 6:30 p.m. to 11:30 p.m. on every Saturday and Sunday. An average of approximately 300 patrons attended the bingo games each night that the games were held. Beginning in 1993, petitioner also sold instant pull-tab tickets at one or two other locations on each Saturday and Sunday from 10:30 a.m. to 6 p.m. and on every other day of the week from 10:30 a.m. to 7 p.m.[4] Petitioner's sales of instant pull-tab tickets represented most of petitioner's gaming receipts in each of the years 1992 through 1995. In addition to sales of instant pull-tab tickets, petitioner's remaining income for those years was from interest and from petitioner's sales during the bingo games of bingo cards, raffle tickets, and concessions.

Eight or nine individuals generally worked in the bingo hall on each night that the games were held. These individuals consisted of bingo workers, instant pull-tab ticket workers, concession workers, kitchen workers, a security guard, and one or two game administrators (Clausing and/or Mark Carroll (Carroll),

---

[3](...continued)
Whether the instant pull-tab ticket contained one of the predesignated symbols was a matter of luck.

[4] In 1993, 1994, and 1995, petitioner sold instant pull-tab tickets at a storefront booth in Middletown, Ohio. In 1994 and 1995, petitioner also sold instant pull-tab tickets at a second booth.

petitioner's vice president). Petitioner recruited its bingo, instant pull-tab ticket, concession, and kitchen workers (collectively, nonofficer/nonsecurity guard workers) through informal means such as by word of mouth. All of petitioner's nonofficer/nonsecurity guard workers were trained by one of petitioner's officers, Diane Whitaker (Whitaker). Whitaker instructed those workers on how to handle money and how to keep certain records. Whitaker also scheduled petitioner's gaming activities and approved any time off taken by the nonofficer/ nonsecurity guard workers. Whitaker (and/or another one of petitioner's officers) informed these workers that they would be paid in cash for their services and that they were not to discuss this payment arrangement with anyone.

The services performed in the gaming operation by the nonofficer/nonsecurity guard workers were demanding, and it was not easy for those workers to take a day off. Many of those workers were pressured to work in the bingo games on both Saturday and Sunday, were required to give advance notice for any vacation time that they sought, and seldom received time off. Petitioner required that its nonofficer/nonsecurity guard workers who worked at the bingo games be at the bingo hall from 4:30 p.m. until approximately just after 11:30 p.m. As of the latter time, the workers were then required to accompany Clausing (and/or Carroll) to a bank where the receipts from that night's

activities were deposited. Petitioner generally paid each of its nonofficer/nonsecurity guard workers $65 in cash a day for his or her work in the gaming operation (exclusive of tips or Christmas bonuses). Petitioner did not report any of these payments either to the recipient (e.g., through a Form W-2, Wage and Tax Statement) or to respondent. In addition to working for petitioner in the gaming operation, many of the nonofficer/ nonsecurity guard workers also worked fulltime for employers other than petitioner. At least one of the nonofficer/ nonsecurity guard workers traveled more than 20 miles to work in the gaming operation.

Ohio law requires that a security guard be present during the bingo games, and petitioner paid a security agency to furnish a security guard to work at the bingo games while the games were conducted. Petitioner also paid the security agency to furnish a security guard to work with petitioner's instant pull-tab ticket workers when, and on the sites where, the instant pull-tab tickets were sold. For the services of these security guards, petitioner paid the security agency $7,776, $12,936, $9,908, and $11,643 during 1992 through 1995, respectively.

Clausing was petitioner's president and full-time administrator from 1992 through 1995. He worked for petitioner an average of 30 hours per week in 1992 and an average of 35 hours per week in 1993 through 1995. During 1992 through 1995,

petitioner reportedly paid Clausing compensation of $4,800, $27,600, $32,428, and $41,627, respectively. As to the gaming operation, Clausing negotiated the bingo supply contracts, ran the bingo games, handed out tickets at the bingo games, collected the proceeds from petitioner's sales of bingo cards and instant pull-tab tickets, deposited most of petitioner's daily proceeds in the bank, prepared daily sheets, and managed petitioner's inventory (e.g., of instant pull-tab tickets). Clausing also each day visited the sites where petitioner sold its instant pull-tab tickets and, when there, counted money and prepared daily sheets. As to petitioner's activities other than the gaming operation (nongaming operation), Clausing ran petitioner's monthly board meetings, made annual decisions about grants, and wrote checks to petitioner's grant recipients. The amount of time that Clausing spent on petitioner's nongaming operation was substantially less than the amount of time that Clausing spent on the gaming operation.

Carroll was petitioner's vice president in 1992 through 1995 and an administrator of its gaming operation in 1994 and 1995. Carroll reportedly was not paid by petitioner in 1992 and 1993. Petitioner reportedly paid Carroll $18,928 and $23,427 in 1994 and 1995, respectively. Carroll worked for petitioner an average of 10 hours per week in 1994 and an average of 40 hours per week in 1995. As part of his work for petitioner, Carroll sometimes

visited the sites where the instant pull-tab tickets were sold and supervised the bingo games.

From 1992 through 1995, petitioner received no public support. For those years, petitioner reported to respondent that its gross income was as follows:

| Year | Gaming Operation | Interest Income |
|------|------------------|-----------------|
| 1992 | $871,893 | $20,199 |
| 1993 | 1,305,461 | 7,128 |
| 1994 | 2,085,332 | 11,456 |
| 1995 | 2,043,145 | 11,291 |

During petitioner's audit, Clausing and petitioner's counsel informed petitioner's workers that one of respondent's agents might question the workers on whether they were paid by petitioner for their work in the gaming operation. Clausing and petitioner's counsel advised the workers on what they should and should not say in response to the questions.

OPINION

Section 501(a) generally provides that organizations described in section 501(c) are exempt from Federal income tax. Section 501(c)(3) includes within that description certain "Corporations * * * organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes". Exemptions from tax are exceptions to the norm, and petitioner bears a heavy burden to

prove that it falls within the terms of the quoted text.[5]  See

Harding Hosp., Inc. v. United States, 505 F.2d 1068, 1071 (6th

Cir. 1974); see also Fla. Hosp. Trust Fund v. Commissioner, 103

T.C. 140, 146 (1994) (taxpayers generally bear the burden of

proving that the Commissioner improperly revoked an exemption

from tax under section 501), affd. 71 F.3d 808 (11th Cir. 1996).

In order for petitioner to prevail on the issue that we

decide herein, we must find that petitioner was both organized

and operated exclusively for one or more exempt purposes.  See

sec. 1.501(c)(3)-1(a), Income Tax Regs.  We focus on the

statute's requirement as to operation because the parties do not

dispute the statute's requirement as to organization.  Under the

regulations, an "organization will be regarded as 'operated

exclusively' for one or more exempt purposes only if it engages

primarily in activities which accomplish one or more of such

exempt purposes specified in section 501(c)(3)."  Sec.

---

[5] Sec. 7491(a) was added to the Code by the Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(c), 112 Stat. 727, effective for court proceedings arising from examinations commencing after July 22, 1998.  Sec. 7491(a)(1) provides that the burden of proof shifts to the Commissioner in specified circumstances.  We need not and do not decide whether sec. 7491(a)(1) applies in the setting of a declaratory judgment action such as we have here.  Petitioner in its posttrial brief makes no mention of sec. 7491(a)(1), and we conclude that, even if sec. 7491(a)(1) did apply in the setting of a declaratory judgment action, it would not apply here.  See, e.g., sec. 7491(a)(2) (sec. 7491(a)(1) applies with respect to an issue only if the taxpayer establishes certain requirements); see also Mediaworks, Inc. v. Commissioner, T.C. Memo. 2004-177.

1.501(c)(3)-1(c)(1), Income Tax Regs. "An organization will not be so regarded if more than an insubstantial part of its activities is not in furtherance of an exempt purpose." Id.; see also Orange County Agric. Socy., Inc. v. Commissioner, 893 F.2d 529, 532 (2d Cir. 1990), affg. T.C. Memo. 1988-380.

Respondent revoked petitioner's tax-exempt status effective January 1, 1992. Respondent advances the following grounds for revocation: (1) Petitioner had as its primary activity the operation of a trade or business, i.e., its gaming operation, that was not in furtherance of its exempt purpose, (2) petitioner operated as a "feeder organization" within the meaning of section 502, and (3) petitioner's operation served the private interests of its founder, Parr, and his company. Petitioner argues in response to respondent's determination that petitioner was operated exclusively for an exempt purpose. According to petitioner, its gaming operation should not be deemed unrelated to its exempt purpose in that, it asserts, all of the work in carrying on its gaming operation was performed by uncompensated workers. Cf. sec. 513(a)(1). Respondent disputes that substantially all of the work in that operation was uncompensated. We agree with respondent that petitioner's carrying on of the gaming operation disqualified petitioner from the tax exemption that it seeks to retain.

In support of their respective positions, the parties each called witnesses to testify about any compensation paid by petitioner for services performed in the gaming operation. Petitioner's witnesses on this subject were Clausing, Parr, Edward Helton (Helton), Shawna Phillips (Phillips), Karen Cornett (Cornett), and Lulu Blair (collectively, petitioner's six witnesses). Petitioner's six witnesses generally testified that they were not paid for any services that they performed in the gaming operation and that they believed none of petitioner's workers was paid for his or her work in the gaming operation. Respondent's witnesses on this subject were Jessica Seaks, Melissa Conyer, and Linda Grooms (collectively, respondent's three witnesses). Respondent's three witnesses generally testified that petitioner surreptitiously paid both them and each other nonofficer worker cash of $65 a day (exclusive of tips and Christmas bonuses) and that one or more of petitioner's officers instructed them (respondent's witnesses and petitioner's other nonofficer/nonsecurity guard workers) not to disclose this payment arrangement to anyone.

Our resolution of this dispute turns mainly on a determination of the credibility of petitioner's six witnesses and respondent's three witnesses. Such a determination epitomizes the ultimate duty of a trial court, as trier of fact, to determine the truth of a matter on the basis of conflicting

oral testimony.  We must be wary, on the one hand, of the courtroom's becoming a quagmire in which an honest litigant is mired and, on the other hand, of the courtroom's becoming a refuge for the proficient liar.  See Diaz v. Commissioner, 58 T.C. 560, 564 (1972); Hawkins v. Commissioner, T.C. Memo. 1993-517, affd. without published opinion 66 F.3d 325 (6th Cir. 1995).  We have evaluated each referenced witness's testimony by observing his or her candor, sincerity, and demeanor and by assigning weight to the elicited testimony for the primary purpose of finding disputed facts.  See Neonatology Associates v. Commissioner, 115 T.C. 43, 84 (2000), affd. 299 F.3d 221 (3d Cir. 2002).  We determine the credibility of each witness, weigh each piece of evidence, draw appropriate inferences, and choose between conflicting inferences in finding the facts of a case. See id.; see also Gallick v. Baltimore & O.R. Co., 372 U.S. 108, 114-115 (1963); Boehm v. Commissioner, 326 U.S. 287, 293 (1945); Wilmington Trust Co. v. Helvering, 316 U.S. 164, 167-168 (1942).

We hear and view the testimony of respondent's three witnesses to be more credible than that of petitioner's six witnesses, whom we find to be not credible.  Our perception of petitioner's six witnesses (and our resulting disregard of their testimony) is supported by our review of independent indicia of reliability found in the record and from the reasonable inferences that we draw therefrom.  First, Clausing, the security

guards, and Carroll (at least in 1994 and 1995) were undisputably paid by petitioner for their services, and we find such as a fact. Petitioner asserts that it paid Clausing and Carroll only to work in its nongaming activities and that any work they performed in the gaming operation was without compensation. We consider that assertion to be incredible. We find as a fact that petitioner's payments to Clausing and Carroll were at least in part payment for services that they performed in connection with the gaming operation. Indeed, we would be hard put to find to the contrary given that almost all of petitioner's resources (including the time of its workers) were devoted to the gaming operation and that the gaming operation represented the lion's share of petitioner's activities. We conclude from the record before us that Clausing's and Carroll's compensation from petitioner was attributable in small part to their services in petitioner's nongaming activity and, for the most part, to their services in the gaming operation. The mere fact that petitioner may label all of their compensation as being paid only for the former purpose is not dispositive of this matter.

Second, as we understand it, none of the four of petitioner's six witnesses who received the $65 payments from petitioner ever reported those payments as income.[6] Petitioner

---

[6] Of petitioner's six witnesses, Clausing and Parr were never paid the $65 payments.

does not dispute a proposed finding of fact by respondent, which we find as a fact, that Clausing and counsel for petitioner advised petitioner's workers on what the workers should and should not say in response to questions that respondent might ask them during petitioner's audit as to the gaming operation and their compensation therefrom. We believe that each of petitioner's six witnesses at the time of his or her testimony knew that the $65 payments were reportable as taxable income and that those payments were not reported as such. We surmise that petitioner's six witnesses also were generally aware at the time of their testimony of the potential repercussions of not reporting the $65 payments as income and the consequences of any admission that they may make at trial as to that omission.

Third, five of petitioner's six witnesses were generally longtime workers for petitioner who continued to work for petitioner as of the time that they testified in this proceeding, and the sixth, Parr, was petitioner's founder and its key supplier. Petitioner's six witnesses' allegiance to petitioner and to its interests in this proceeding cannot be denied. Petitioner and petitioner's six witnesses all have much to lose from a decision here adverse to petitioner and have much to gain from a decision here favorable to petitioner.

Fourth, we conclude from the record at hand that some if not all of petitioner's four witnesses who received the $65 payments

would have declined to work in the gaming operation had they received no compensation for their services. We find in the record that working in the gaming operation was demanding, that the nonofficer/nonsecurity guard workers were pressured to work in the bingo games on both Saturday and Sunday for a total of 14 hours (exclusive of the additional time that they were required to spend accompanying Clausing and/or Carroll to the bank to deposit the days' receipts), that those workers were required to give advance notice for any vacation time that they sought, and that those workers were seldom given time off. We also find in the record that at least Helton, Phillips, and Cornett also worked full-time for employers other than petitioner and that at least Cornett traveled more than 20 miles to work in the gaming operation. Given that we are unable to find on the basis of credible evidence in the record that any of petitioner's workers worked in the gaming operation out of motivation to further petitioner's educational purpose, or even out of motivation by charitable impulses in general, we are hard pressed to, and do not, conclude that any of petitioner's four witnesses who received the $65 payments would have steadily and consistently worked for petitioner without being paid for his or her services.

As to respondent's three witnesses, we perceive the testimony of those witnesses to be candid, sincere, and credible. Petitioner attempts to discredit that testimony by arguing that

respondent's three witnesses seek revenge against petitioner because their services in the gaming operation were discontinued. We find this attempt unavailing. Given that none of respondent's three witnesses reported her receipt of the $65 cash payments as income, we do not believe that they simply out of revenge testified against their self-interests by admitting clearly and under oath that they received the $65 payments and knowingly did not report those payments as income.

In addition to its witnesses, petitioner relies upon approximately 29 affidavits contained in the administrative record. These affidavits, which were mostly signed in bulk in June or September of 1997 and were submitted to respondent during the audit, were from various workers of petitioner and stated that the affiant was not paid for his or her services in the gaming operation. We are unpersuaded by these affidavits, and we give them no weight. The affiants included 12 workers of petitioner who did not work for petitioner during the relevant years and 4 of petitioner's officers (including Clausing, Carroll, and Whitaker). Many of the affiants did not testify at trial so as to be subject to our determination of their credibility or to questioning as to the circumstances under which they signed or otherwise acquiesced in the statements contained in the affidavits. As to the affidavits, most of them were written pro forma on petitioner's letterhead and were prepared by

petitioner's legal counsel for purposes of respondent's audit (and presumably for purposes of any litigation that resulted thereafter); in some cases, the affidavits were incomplete as to the dates of the affiant's service in the gaming operation. The affidavits for the most part were presented to the affiants for their signature at a monthly board meeting of petitioner in the presence of petitioner's current trial counsel, who signed as notary of many of the affidavits.

Petitioner also challenges a characterization of the security guards as workers in petitioner's gaming operation for purposes of the "substantially all" test of section 513(a)(1). We conclude that the characterization is appropriate. Petitioner argues that the security guards did not work in the gaming operation because they were independent contractors rather than employees. We disagree. The fact that the security guards were directly compensated by another entity through a contract with petitioner is of no consequence to our determination under section 513(a)(1). A plain reading of that section requires that we focus on the "work" performed in "carrying on such trade or business". We read nothing in the statute that limits this work to that performed by employees as opposed to independent contractors. See also Executive Network Club, Inc. v. Commissioner, T.C. Memo. 1995-21 (finding that casino workers paid in tips by players worked for compensation even though the

exempt organization did not pay the workers directly); cf. <u>Piety, Inc. v. Commissioner</u>, 82 T.C. 193, 194 (1984) (finding that workers who conducted bingo games in a building rented by the organization were "compensated" when the organization's rental payments included payment for "all labor for the supervision and handling of each bingo occasion upon the premises").

Petitioner also argues that the security guards were not petitioner's workers in that petitioner paid the security agency to safeguard petitioner against an attempted theft or robbery and the guards did not actually work in carrying on petitioner's gaming operation. In this regard, petitioner asserts, the security guards were not an attraction important to the success of the gaming operation, the security guards provided little labor in the absence of a theft or robbery, and the gaming participants received no direct products or services from the security guards. In addition, petitioner asserts, the guards never called bingo numbers, never sold bingo cards or instant pull-tab tickets, and never assisted in the actual administration of the gaming operation.

We find petitioner's argument unpersuasive. If the security guards had not been present at the bingo games, petitioner would have been precluded from conducting these games by virtue of the State law requirement that security guards be present at bingo games. Moreover, irrespective of that law, the security guards

were physically present at the bingo games and at the locations of the instant pull-tab ticket sales, and they were an integral part of those activities. While petitioner asks this Court to view the role of the security guards narrowly so as not to consider them as working in the gaming operation absent their acting in the setting of a robbery or an attempted robbery, we decline to do so. The role of the security guards as we see it was to prevent a robbery from being attempted in the first place, primarily by virtue of their physical presence at the sites of the bingo games and the instant pull-tab ticket sales. We consider the security guards to be part of the workforce of the gaming operation, cf. Waco Lodge No. 166, Benevolent & Protective Order of Elks v. Commissioner, 696 F.2d 372 (5th Cir. 1983) (concluding that a bartender's services on bingo night were connected with the carrying on of the bingo games although the bar was down the hall from the games), affg. T.C. Memo. 1981-546, and conclude that the security guards worked in the gaming operation for purposes of the "substantially all" test.

Accordingly, on the basis of our review of the record before us, we find that many (if not all) of the workers in the gaming operation were compensated for their work. We do not find that any of the workers in the gaming operation were uncompensated within the meaning of section 513(a)(1). The gaming operation was petitioner's principal activity and was conducted by

petitioner as a business for profit.  Petitioner does not argue, nor do we find, that this activity was in furtherance of its exempt purpose.[7]  We therefore conclude that respondent properly revoked petitioner's tax-exempt status effective January 1, 1992, because petitioner was not operated exclusively for an exempt purpose.  See Help the Children, Inc. v. Commissioner, 28 T.C. 1128 (1957); cf. Piety, Inc. v. Commissioner, supra.  While Congress allows certain organizations tax-exempt status for specific limited activities, petitioner attempts to retain tax-exempt status for activities that are outside of those permitted.

We have considered all arguments made by petitioner for a contrary holding, and we conclude that any of those arguments not discussed herein is without merit.

Decision will be entered for respondent.

---

[7] Nor does petitioner argue in its posttrial brief that any part of its activities is a "bingo game" as defined in sec. 513(f)(2).  In fact, as to petitioner's sale of instant pull-tab tickets, the source of most of petitioner's gaming receipts in each of the years 1992 through 1995, the parties have stipulated that petitioner's instant pull-tab ticket activity is not a "bingo game" as defined in sec. 513(f)(2).  See also Julius M. Israel Lodge of B'nai B'rith No. 2113 v. Commissioner, 98 F.3d 190 (5th Cir. 1996) (affirming this Court's determination that instant bingo games are not "bingo games" within the meaning of sec. 513(f)(2)), affg. T.C. Memo. 1995-439.