T.C. Memo. 2007-85

UNITED STATES TAX COURT

RAMESES SCHOOL OF SAN ANTONIO, TEXAS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 23228-04X.                    Filed April 10, 2007.

        P was established as a nonprofit corporation under
the laws of the State of Texas for the purpose of
operating a school providing education to children in
the San Antonio area.  P initially received recognition
from R as an organization described in sec. 501(c)(3),
I.R.C., which recognition R now seeks to revoke.

        <u>Held</u>:  P furthers private interests and therefore
is not operated exclusively for exempt charitable
and/or educational purposes.  Consequently, P is not
entitled to exemption from income taxation under sec.
501(a), I.R.C., as an organization described in sec.
501(c)(3), I.R.C.

<u>Victor L. Smith</u>, for petitioner.

<u>Michael K. Park</u> and <u>Virginia E. Cochran</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WHERRY, Judge:  Respondent determined that Rameses School of San Antonio, Texas (petitioner), no longer qualified for exemption from Federal income taxation under section 501(a) as an organization meeting the requirements of section 501(c)(3).[1] Respondent therefore revoked petitioner's tax-exempt status effective September 22, 1995.  Petitioner challenged respondent's determination by timely invoking the jurisdiction of this Court for a declaratory judgment pursuant to section 7428.  In accordance with Rule 217, the administrative record underlying respondent's determination was filed with the Court, and a subsequent trial was conducted.  At this juncture, the issue for decision is whether petitioner is operated exclusively for exempt purposes (i.e., educational and/or charitable) within the meaning of section 501(c)(3).

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of the parties, with accompanying exhibits, are incorporated herein by this reference.

---

[1] Unless otherwise indicated, section references are to the Internal Revenue Code of 1986, as amended, and Rule references are to the Tax Court Rules of Practice and Procedure.

Founding and Operations

Petitioner was formed as a nonprofit corporation under the laws of the State of Texas on September 22, 1995. Pursuant to its articles of incorporation, petitioner was organized for the stated exempt purpose of operating a school "to provide a sound education for all school-age children within the City of San Antonio and Bexar County, Texas." At all relevant times petitioner has maintained its principal place of business in San Antonio, Texas. Patricia L. Fennell (Ms. Fennell), founder of petitioner, has from its inception served as the school's executive director, president, and CEO. Basil H. Franks (Mr. Franks), apparently also known as Basil Kamau Atum, was likewise involved in the founding, incorporation, and early operations of petitioner. Mr. Franks resigned from further participation in May of 1996. The articles of incorporation and the bylaws adopted in accordance therewith provided for a board of directors to oversee governance of petitioner.

During 1996, petitioner submitted to the Internal Revenue Service (IRS), a Form 1023, Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code. By letter dated May 9, 1997, petitioner received recognition from the IRS as an organization exempt from taxation under section 501(a) by reason of being described in section 501(c)(3). Exempt status under section 501(c)(3) rendered petitioner eligible under

the Texas Education Code to apply for an open-enrollment charter, and thereby to be recognized as a State public school entitled to receive public funding.  See Tex. Educ. Code Ann. sec. 12.101(a)(3) (Vernon 1996).  Petitioner so applied and on May 14, 1998, obtained from the Texas State Board of Education (SBOE) the requested open-enrollment charter.[2]  The charter, in accordance with applicable State law, imposed upon petitioner conditions related to its operations, including rules to require compliance with generally accepted accounting principles (GAAP) and recordkeeping standards, to restrict conflicts of interest and less than arm's-length transactions, and to adhere to specific dictates governing student attendance and special education programs.

In 1995, petitioner began operating a school offering pre-kindergarten through grade 12 instruction to children.  The school employed what is referred to as a "multi-age level" or "one-room schoolhouse" setting.  Records suggest that student enrollment grew from about 10 in early years to approximately 100 by 1999.  Throughout its history, the school has focused on serving a racially and ethnically diverse, economically

---

[2] Although the parties' stipulation references "March of 1998" in connection with receipt of the open-enrollment charter, a cursory review of the underlying document reveals that the contract for charter was entered and executed on May 14, 1998. See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989) (holding that stipulations are properly disregarded where clearly contrary to evidence contained in the record).

disadvantaged population, with the majority of the student body drawn from minority groups.

Classes were initially conducted in property leased to the school at 315 North Hackberry Street in San Antonio, Texas. By cash warranty deed dated February 10, 1998, petitioner became the record owner of property at 309 North Hackberry Street and 527 and 531 North Center Street in San Antonio. The 309 North Hackberry Street location has since constituted the school's principal place of business. By a rental agreement dated May 1, 1998, Ms. Fennell purported to lease the 309 North Hackberry and 527 North Center properties to petitioner for $1,500 and $1,000 per month, respectively.

Personally, Ms. Fennell is the record owner of properties at 902 East Crockett and 442 Westminster Avenue in San Antonio. The latter property constitutes Ms. Fennell's principal residence.

Petitioner maintained various commercial checking accounts at Frost National Bank. Ms. Fennell possessed check writing authority on these accounts. Checks from petitioner's bank accounts were issued to make purchase price and mortgage payments on the properties titled to Ms. Fennell in her personal capacity at 902 East Crockett and 442 Westminster Avenue. Petitioner's funds were likewise used to make payments on leases entered by Ms. Fennell as an individual on other properties. Ms. Fennell also from petitioner's bank accounts issued checks to herself as

payee and made cash withdrawals for which the record reflects no documented and established business purpose. Business purpose or board authorization is similarly lacking for thousands of dollars of expenditures directed to retail stores, credit card companies, financial institutions, Ms. Fennell's dentist, and other businesses. Nor does the record suggest any documented system either (1) of loans to and repayments by Ms. Fennell or (2) of loans by Ms. Fennell and reimbursements from the school.

State Administrative Proceedings

Public education in Texas is overseen by the SBOE, a body of 15 members elected by the voters, and by the commissioner of education, an individual appointed by the governor and confirmed by the State senate. Tex. Educ. Code Ann. secs. 7.051, 7.055, 7.101, 7.102 (Vernon 1996). The SBOE carries out its statutorily prescribed powers and duties, which consist in large part of establishing educational policies, programs, and standards, with the assistance of the commissioner of education. Tex. Educ. Code Ann. sec. 7.102. The commissioner of education, in turn, heads the administrative agency, the Texas Education Agency (TEA or the agency), charged with administering and monitoring compliance with educational programs. Tex. Educ. Code Ann. secs. 7.002, 7.021 (Vernon 1996).

In February of 1999, the commissioner of education directed the TEA to conduct a financial status audit of petitioner.

Following issuance by the TEA of findings reflecting a number of improprieties, the commissioner directed the agency to conduct an on-site investigation into the fiscal management of the school. The on-site investigation took place on March 25-29 and 31, 1999, and the TEA issued its final report of findings on June 23, 1999. Given that the investigative audit had revealed legal and material violations of petitioner's open-enrollment charter, the report recommended that the TEA institute proceedings for adverse action, i.e., revocation of the charter, by the SBOE.

Accordingly, the TEA instituted a proceeding before the SBOE. An administrative law judge was assigned to preside over the resultant hearing and to render a proposal for decision in the matter. A 2-day hearing, which included the presentation of documentary evidence and witness testimony, was conducted on November 9 and 10, 1999, and petitioner was represented by attorney Roger Stephens. On November 18, 1999, the administrative law judge issued a proposal for decision containing 48 separate findings of fact, a discussion summarizing those findings and their import, and specific conclusions of law. The proposal ultimately recommended that petitioner's charter be revoked.

The following excerpt from the proposal's discussion encapsulates the enumerated findings and conclusions:

> It is clear from the evidence that RSSAT was being operated without a functioning board of directors. Two

directors were reflected in board minutes as having attended meetings; however, the directors did not attend meetings as the minutes reflect. In fact, the directors were not even aware of the meetings. The original budget was never amended as required to reflect a decrease in the number of projected students in attendance. The school accounts were being used for personal purposes by the executive director of the school without any oversight by the board of directors. Documents submitted by the executive director as support for additional payments were altered prior to submission to the agency. Student attendance records were inflated, resulting in overpayments to the school. Special education requirements were ignored until the end of November of 1998; entries of temporary placements were made well after the fact without the knowledge and consent of the original makers of documents. Required special education ARD meetings were not held, and mandatory forms were not completed.

In short, the evidence establishes that the executive director had unfettered discretion to direct and manage the operation of RSSAT and its financial affairs. As a direct result of this unilateral authority, the school failed to meet the requirements of the charter contract, failed to comply with GAAP and failed to meet applicable laws and rules.

The open-enrollment charter of RSSAT should be revoked.

On January 14, 2000, after review of the proposal and any exceptions thereto submitted by the parties, the SBOE issued a decision that: (1) "FOUND" that the findings of fact, discussion, and conclusions of law contained in the November 18, 1999, proposal for decision were proven by a preponderance of the evidence; (2) "ORDERED" that those findings of fact, discussion, and conclusions of law were "ADOPTED" by the SBOE for all purposes; and (3) "ORDERED" that the open-enrollment charter of the school was "REVOKED" effective January 14, 2000.

Subsequently, on March 3, 2000, the SBOE issued a final order denying the school's motion for rehearing.

IRS Examination

Examination by the IRS into petitioner's tax-exempt status began in late 2001, precipitated by the forwarding to the IRS of a newspaper article reporting the revocation of the school's charter. The IRS conducted an investigation into whether petitioner complied with the standards imposed under section 501(c)(3). In particular, the IRS sought financial and governance records in order to verify the information reported by petitioner on Forms 990, Return of Organization Exempt from Income Tax, and to evaluate the records for possible instances of private benefit and personal inurement. To that end, dozens of information document requests were issued to petitioner, but only a very limited portion of the requested materials was ever provided, and often only after repeated inquiries, missed or delayed appointments, and a general lack of cooperation on the part of petitioner. Consequently, additional information was sought and obtained from third-party sources, including public records and the TEA.

The examination culminated with issuance on September 8, 2004, of the final adverse determination underlying this litigation. The conclusion was that petitioner failed to establish that it was operated exclusively for an exempt purpose,

in that it was operated for the benefit of private interests and a part of net earnings inured to the benefit of its founder Ms. Fennell.

OPINION

## I. General Rules--Exempt Status

Section 501(a) exempts from Federal income taxation organizations described in section 501(c). Among the organizations so described are those set forth in section 501(c)(3):

> (3) Corporations * * * organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition * * * , or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual * * *

In order to be exempt under section 501(c)(3), an organization must be both organized exclusively for one or more of the exempt purposes specified in the section, known as the organizational test, and operated exclusively for such purposes, known as the operational test. See sec. 1.501(c)(3)-1(a)(1), Income Tax Regs. Failure to satisfy either test forecloses a section 501(c)(3) exemption. Id.

In application of the organizational and operational tests, "exclusively" does not mean "'solely'" or "'absolutely without exception'". Nationalist Movement v. Commissioner, 102 T.C. 558, 576 (1994) (quoting Church in Boston v. Commissioner, 71 T.C.

102, 107 (1978)), affd. 37 F.3d 216 (5th Cir. 1994); see also Copyright Clearance Ctr., Inc. v. Commissioner, 79 T.C. 793, 803-804 (1982). Nonetheless, the presence of a single nonexempt purpose, if substantial in nature, precludes exempt status, regardless of the number or importance of truly exempt purposes. Better Bus. Bureau v. United States, 326 U.S. 279, 283 (1945); Redlands Surgical Servs. v. Commissioner, 113 T.C. 47, 71-72 (1999), affd. 242 F.3d 904 (9th Cir. 2001); Nationalist Movement v. Commissioner, supra at 576; Am. Campaign Acad. v. Commissioner, 92 T.C. 1053, 1065 (1989).

To satisfy the exclusivity requirement as it pertains to the organizational test, the entity's articles of organization must limit its purposes to those which are exempt and must not expressly empower it to engage, except in insubstantial part, in activities not in furtherance of exempt purposes. Sec. 1.501(c)(3)-1(b)(1)(i)(a) and (b), Income Tax Regs. The articles or applicable law must also ensure that, upon dissolution of the organization, assets would not be distributed to its members or shareholders. Sec. 1.501(c)(3)-1(b)(4), Income Tax Regs.

With respect to the operational test:

An organization will be regarded as "operated exclusively" for one or more exempt purposes only if it engages primarily in activities which accomplish one or more of such exempt purposes specified in section 501(c)(3). An organization will not be so regarded if more than an insubstantial part of its activities is not in furtherance of an exempt purpose. [Sec. 1.501(c)(3)-1(c)(1), Income Tax Regs.]

The operational test also reinforces the express dictates of section 501(c)(3) in that an entity is deemed not to operate exclusively for exempt purposes if net earnings are distributed or otherwise inure to the benefit of private individuals or if its activities involve proscribed political involvement. Sec. 1.501(c)(3)-1(c)(2) and (3), Income Tax Regs. Additionally, although an organization may be engaged only in a single activity directed toward multiple purposes, both exempt and nonexempt, failure to satisfy the operational test will result if any nonexempt purpose is substantial. Redlands Surgical Servs. v. Commissioner, supra at 71; Copyright Clearance Ctr., Inc. v. Commissioner, supra at 803-804.

Exempt purposes, in turn, are those specified in section 501(c)(3), such as religious, charitable, scientific, and educational. Sec. 1.501(c)(3)-1(d)(1)(i), Income Tax Regs. Charitable is further defined as follows:

> The term "charitable" is used in section 501(c)(3) in its generally accepted legal sense and is, therefore, not to be construed as limited by the separate enumeration in section 501(c)(3) of other tax-exempt purposes which may fall within the broad outlines of "charity" as developed by judicial decisions. Such term includes: Relief of the poor and distressed or of the underprivileged; advancement of religion; advancement of education or science; erection or maintenance of public buildings, monuments, or works; lessening of the burdens of Government; and promotion of social welfare by organizations designed to accomplish any of the above purposes, or (i) to lessen neighborhood tensions; (ii) to eliminate prejudice and discrimination; (iii) to defend human and civil rights secured by law; or (iv) to combat community

deterioration and juvenile delinquency. * * * [Sec. 1.501(c)(3)-1(d)(2), Income Tax Regs.]

Educational is similarly expounded, to wit: "The term 'educational', as used in section 501(c)(3), relates to--(a) The instruction or training of the individual for the purpose of improving or developing his capabilities; or (b) The instruction of the public on subjects useful to the individual and beneficial to the community." Sec. 1.501(c)(3)-1(d)(3)(i), Income Tax Regs. Regulations also list several examples of educational organizations, including "An organization, such as a primary or secondary school, a college, or a professional or trade school, which has a regularly scheduled curriculum, a regular faculty, and a regularly enrolled body of students in attendance at a place where the educational activities are regularly carried on." Sec. 1.501(c)(3)-1(d)(3)(ii), Example (1), Income Tax Regs.

However, regardless of the presence of what might otherwise be proper exempt purposes, an explicit exception to section 501(c)(3) status exists in that:

> An organization is not organized or operated exclusively for one or more of the purposes specified in * * * [section 501(c)(3)] unless it serves a public rather than a private interest. Thus, * * * it is necessary for an organization to establish that it is not organized or operated for the benefit of private interests such as designated individuals, the creator or his family, shareholders of the organization, or persons controlled, directly or indirectly, by such private interests. [Sec. 1.501(c)(3)-1(d)(1)(ii), Income Tax Regs.]

In other words, if an organization can be shown to benefit private interests, a limitation substantially overlapping but encompassing more than simply the inurement of earnings to insiders, it will be deemed to further a nonexempt purpose. Am. Campaign Acad. v. Commissioner, supra at 1066, 1068-1069; Church of the Transfiguring Spirit, Inc. v. Commissioner, 76 T.C. 1, 5 & n.5 (1981). Private benefits within the scope of the prohibition may include an advantage, profit, fruit, privilege, gain, or interest. Am. Campaign Acad. v. Commissioner, supra at 1065-1066.

A substantial body of caselaw has explored the concept of private benefit within the framework of the relationship between an organization claiming tax-exempt status and its founder (or small group of related insiders). See, e.g., Founding Church of Scientology v. United States, 188 Ct. Cl. 490, 412 F.2d 1197, 1199-1202 (1969); Church of Eternal Life & Liberty, Inc. v. Commissioner, 86 T.C. 916, 927-928 (1986); Church of the Transfiguring Spirit, Inc. v. Commissioner, supra at 5-6; Basic Bible Church v. Commissioner, 74 T.C. 846, 856-858 (1980), affd. sub nom. Granzow v. Commissioner, 739 F.2d 265 (7th Cir. 1984); Bubbling Well Church of Universal Love, Inc. v. Commissioner, 74 T.C. 531, 534-538 (1980), affd. 670 F.2d 104 (9th Cir. 1981); Unitary Mission Church v. Commissioner, 74 T.C. 507, 512-515

(1980), affd. without published opinion 647 F.2d 163 (2d Cir. 1981).

Factors emerging repeatedly as indicative of prohibited inurement and private benefit include control by the founder over the entity's funds, assets, and disbursements; use of entity moneys for personal expenses; payment of salary or rent to the founder without any accompanying evidence or analysis of the reasonableness of the amounts; and purported loans to the founder showing a ready private source of credit.  See, e.g., Founding Church of Scientology v. United States, supra at 1200-1202; Church of Eternal Life & Liberty, Inc. v. Commissioner, supra at 927-928; Church of the Transfiguring Spirit, Inc. v. Commissioner, supra at 5-6; Basic Bible Church v. Commissioner, supra at 857-858; Bubbling Well Church of Universal Love, Inc. v. Commissioner, supra at 534-538; Unitary Mission Church v. Commissioner, supra at 513-515.  As this Court has noted, such circumstances provide "an obvious opportunity for abuse of the claimed tax-exempt status" and make incumbent "open and candid disclosure of all facts"; otherwise, "the logical inference is that the facts, if disclosed, would show that petitioner fails to meet the requirements of section 501(c)(3)."  Bubbling Well Church of Universal Love, Inc. v. Commissioner, supra at 535; see also, e.g., Founding Church of Scientology v. United States, supra at 1201; Basic Bible Church v. Commissioner, supra at 858.

Upon a conclusion that relevant facts reveal private benefit, the organization will not qualify as operating primarily for exempt purposes "absent a showing that no more than an insubstantial part of its activities further the private interests or any other nonexempt purposes."  Am. Campaign Acad. v. Commissioner, 92 T.C. at 1066.

II.  Contentions of the Parties

Respondent contends that petitioner's status as an organization exempt from tax under section 501(c)(3) should be revoked.  It is respondent's position that petitioner fails the operational test imposed pursuant to section 1.501(c)(3)-1(c), Income Tax Regs., on grounds that the school was operated to benefit private interests of Ms. Fennell and that part of its net earnings inured to her benefit.  Respondent relies on the evidentiary record compiled throughout this proceeding and also argues, as set forth in an amendment to answer, that the doctrine of collateral estoppel applies to preclude petitioner from relitigating questions of fact central to the instant dispute.

Conversely, petitioner asserts that it satisfies the operational test, operating for public interest as an educational facility.  Petitioner further denies the existence of inurement for personal gain or private interests.  With respect to

collateral estoppel, petitioner challenges application of the doctrine in this context.[3]

III.  Burden of Proof and Status of the Record

As pertains to tax litigation generally, the typical rule with respect to burden of proof is that determinations by the Commissioner are presumed correct, and the taxpayer bears the burden of proving error therein.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  As applied in the particular context of proceedings involving tax-exempt status,

---

[3] To the extent that petitioner on brief renews its objections to respondent's motion for leave to file amendment to answer, and thereby to plead collateral estoppel, the Court affirms the ruling made at trial granting respondent's motion. For reasons more fully explained in the transcript of proceedings, the Court remains convinced that the liberality of the Court's rules concerning amended pleadings and the lack of any real surprise or prejudice to petitioner counsel for acceptance of the amendment.  See Rule 41.

Petitioner also attempts to renew on brief evidentiary objections to exhibits subpoenaed from the TEA and introduced by respondent at trial.  The objections are characterized as "hearsay" and appear to incorporate complaints about the specificity of the subpoena.  The disputed documents constitute public records and/or records of a regularly conducted business activity and were accompanied by a written declaration from the TEA certifying their authenticity.  None of petitioner's allegations cast doubt on the admissibility of the documents under Fed. R. Evid. 803(6), 803(8), 902(4), and/or 902(11).  It is also noteworthy that nearly all of the proffered materials were already a part of the record in this case on account of the presence of copies in the administrative record.  Respondent resubmitted the documents during trial in order to provide certified copies.  The Court is satisfied that petitioner's objections were properly overruled.

it likewise is well settled that the organization bears the burden of overcoming the grounds set forth in the Commissioner's final ruling letter.  See, e.g., <u>Am. Campaign Acad. v. Commissioner</u>, <u>supra</u> at 1063-1064; <u>Basic Bible Church v. Commissioner</u>, 74 T.C. at 856.

Because an exemption is a deviation from the norm of taxation, courts have reasoned that "a heavy burden" to establish satisfaction of all requisites for such status falls on the entity.  <u>Harding Hosp., Inc. v. United States</u>, 505 F.2d 1068, 1071 (6th Cir. 1974).  In the words of the Court of Appeals for the Fifth Circuit, to which appeal in the instant case would normally lie:  "It is the burden of the party claiming the exemption, of course, to prove entitlement to it."  <u>Senior Citizens Stores, Inc. v. United States</u>, 602 F.2d 711, 713 (5th Cir. 1979).

There exist, however, several exceptions to the general rule.  Section 7491(a)(1) may shift the burden to the Commissioner with respect to factual issues where the taxpayer introduces credible evidence, but the provision operates only where the taxpayer establishes that he or she has complied under section 7491(a)(2) with all substantiation requirements, has maintained all required records, and has cooperated with reasonable requests for witnesses, information, documents, meetings, and interviews.  See H. Conf. Rept. 105-599, at 239-240

(1998), 1998-3 C.B. 747, 993-994.  Here, petitioner has made no argument directed toward section 7491 and consequently has not shown that all necessary prerequisites for a shift of burden have been met.  Additionally, the record is replete with evidence suggesting lack of cooperation.  Hence, regardless of the applicability of section 7491 in the setting of a declaratory judgment action, an issue we do not reach, it is clear that it would afford no relief to petitioner in this situation.  See <u>S. Cmty. Association v. Commissioner</u>, T.C. Memo. 2005-285.

Nonetheless, an additional exception is relevant to this proceeding.  The Commissioner bears the burden of proof with respect to any new matter raised in the answer.  Rule 142(a)(1).  By amendment to answer, respondent here expressly pleaded collateral estoppel.  To summarize, then, the burden rests on petitioner to establish that it was operated exclusively for exempt purposes, specifically overcoming the determination by respondent of private inurement and benefit.  Respondent, on the other hand, would have to shoulder the burden of showing applicability of collateral estoppel to prevent petitioner from relitigating questions of fact pertaining to such issues of inurement, benefit, and the operational test.

However, because the voluminous record in this case is replete with evidence that would compel the Court, in an independent weighing of the materials presented and without

regard to any binding effect of the SBOE decision, to make findings essentially identical to those of the SBOE to the extent relevant to the result we reach here, we conclude that it is unnecessary to probe the applicability of collateral estoppel. To further explain, petitioner at trial, in support of its position, offered only a single documentary exhibit and the testimony of three witness. The document was a copy of the school's articles of incorporation, identical in every material respect to multiple copies already contained in the administrative record. The witnesses were a teacher who worked at the school for a year, a part-time teacher's aide who assisted at the school for 2 or 3 months, and Ms. Fennell. Neither of the former two could recall the specific time period during which they were associated with petitioner. Most critically, the testimony proffered by all three was generalized, conclusory, and patently insufficient to cast any serious doubt on the details regarding particular transactions and events evinced by the administrative record.

For example, the testimony elicited on direct examination from the teacher regarding issues such as private benefit consisted of the following:

> Q    Okay.  Are you aware whether, or did you see as a teacher her [Ms. Fennell] participating in any board meetings or anything while you were there?

> A    Yes. There were board meetings.  We had, like, I think there were two or three board meetings.

Q    Okay.  Now, as far as the expenses, to your knowledge, with Rameses School, things that you have eye witnessed or you have seen, have you seen Ms. Fennell take school resources and use them for her own personal benefit or gain?

A    No, I haven't.

When probed on cross-examination as to the basis for his statements, the teacher noted that he saw money being used for "equipment", "computers and stuff", and "books" but, with respect to Ms. Fennell's "personal deal" did not see "any new car", "any new house", "diamonds, gold, all this type of stuff". Similarly, the only question of the teacher's aide directed toward the issues at hand was:  "Have you ever seen anything illegal or improper at Rameses School?", and the response:  "No, sir."

Even Ms. Fennell's testimony was similarly nebulous and indefinite.  Rather than specifically addressing any of the particular, allegedly self-dealing, transactions reflected in petitioner's bank records, counsel for petitioner inquired: "Okay.  Let me ask you concerning, as far as, did you make any dispositions or any checks under Rameses School for your own personal gain or benefit?"  Ms. Fennell answered:  "No, none for my own personal gain or benefit."  Testimony regarding real estate was nearly as opaque.  Instead of probing particular rental or loan agreements or payments, counsel asked questions such as "What I'm asking is--did you buy any real estate for

personal gain or benefit?", to which Ms. Fennell replied: "No, I have not purchased any real estate for personal gain. All the real estate involved in the questions surrounding Rameses School was purchased for the intent of the school. It was purchased for the intent of classrooms, playgrounds, gyms, things like this, for Rameses School."

Thus, given the lack of probative value in the evidence offered by petitioner at trial, whether or not petitioner is permitted to relitigate factual issues addressed by the SBOE is of little practical moment. The documentary record and the SBOE decision speak with a consistent voice, and petitioner has put forward nothing convincing to the contrary.

IV. Analysis--Revocation of Exempt Status

Petitioner's exempt status was revoked on account of failure to satisfy the operational test, which failure in turn was based on private benefit and inurement. Accordingly, the critical inquiry in this case is whether the facts support a determination of private benefit. As set forth in detail supra, much caselaw has revolved around questions of private benefit as between an entity and its founder. Factors highlighted as indicative of a prohibited relationship have included control by the founder over the entity's funds, assets, and disbursements; use of entity moneys for personal expenses; payment of salary or rent to the founder without any accompanying evidence or analysis of the

reasonableness of the amounts; and purported loans to the founder showing a ready private source of credit.  Nearly all of these factors are present here.

Express findings of fact from the SBOE proceeding provide a vivid encapsulation of the evidence contained in the record on these topics and are worth quoting at some length:

> ***Creation, Implementation and Review of the School's Budget by the Board of Directors; General Oversight of the School***
>
>     \*      \*      \*      \*      \*      \*      \*
>
>     8.   By failing to adopt as a current and legally adequate budget, RSSAT's governing board failed in its duty to provide oversight, direction, supervision, and control over the administration of the school as required by the charter.  Further, as a result of this failure, Ms. Fennell has exercised budget authority for the school without the oversight and direction of the board of directors as required by the charter.
>
>     \*      \*      \*      \*      \*      \*      \*
>
> ***Compensation of Ms. Fennell; Other Questionable Financial Transactions***
>
>     11.   While RSSAT's board approved a salary of $5,000.00 per month for Ms. Fennell as the school administrator, the school's payroll journal showed salary amounts in excess of $5,000.00 per month.  In November 1998, December 1998 and January 1999, Ms. Fennell was paid $8,000.00, $11,857.00 and $10,000.00 respectively.  Although Ms. Fennell asserted that the excess amounts were awarded as reimbursement for money that she had loaned the school, the documentation that she personally presented to TEA in support of her claim had clearly been altered.  For example, dates on checks had been changed to correspond to the appropriate time period and invoices were altered to reflect higher amounts.  Further, there is no documentation that the board of directors authorized the payment of additional amounts of salary.

12. No documentation exists to support expenditures of $7,252.00 in fourteen counter checks by Ms. Fennell. Some checks drawn on the school's account by Ms. Fennell paid for personal services such as dental work. Ms. Fennell paid Bandera Dental $224.00 for a dental cleaning using Rameses School check #409 on October 2, 1998. No documentation exists to demonstrate that checks such as these were payment for school-related services. The payments were not approved by the board of directors pursuant to an amended budget.

13. In addition to the counter checks described in Finding of Fact No. 12, Ms. Fennell made unexplained cash withdrawals on the school's account. No documentation exists establishing that the withdrawals are directly connected to school-related expenditures, although Ms. Fennell informed agency staff that the withdrawals reimbursed her for the expenditure of her personal funds for school purposes. The payments were not approved by the board of directors.

### *Real Estate Transactions and Lease Payments*

14. Ms. Fennell, as "president and CEO of Rameses School, Inc. [sic], Founder, Owner" received a cash warranty deed from Vera Williams-Young, grantor, for property located at 309 North Hackberry Street, 527 North Center Street and 531 North Center Street. Ms. Fennell leased the properties located at 309 North Hackberry Street and 527 North Center Street to the Rameses School. The school occupied these properties. The rental agreement provided that the monthly rents for the Hackberry property and the North Center property were $1,500.00 a month and $1,000.00 a month, respectively. The agreement was unique and did not resemble traditional lease agreements. It contained only one signature, that of Ms. Fennell, and did not contain a specific term of years. No board minutes exist demonstrating notice, acceptance or ratification of the lease. No lease payments were documented by the school. Further, if in fact the school owned the property, the school was leasing the property from itself under the owner rental agreement.

15. There is evidence of other lease payments in the latter part of 1998: $720 to Chase Manhattan Bank for a "mortgage lease payment"; $6,500 to Alfredo

Guzman (902 E. Crockett); $1,000 to Sara Guzman; $500 to Jean Parker; $3,300 to J. Guy Sowells (517 Center); and $3,300 to James Goodman (525 Center Street). No lease agreements were produced by the school, and no real estate transactions supporting these transactions were found during a deed records search.

16. Ms. Fennell bought the property at 902 E. Crockett from Alfred Guzman as an individual and not as a representative of RSSAT. Ms. Fennell issued Rameses School check Number 0454, dated October 9, 1998, to Mr. Guzman as a payment for the property. [Citations omitted.]

The foregoing factual circumstances, independently borne out by the documentary record, are more than sufficient to establish prohibited private benefit. Furthermore, even if petitioner were permitted to challenge the SBOE findings, its response on brief consists solely of short, unsupported, and conclusory statements of denial. For example, the school's entire argument on opening brief on the inurement and private benefit issue reads:

Plaintiff presented witnesses to testify that board meetings were regularly conducted and that Plaintiff did not personally benefit or receive personal gains. Plaintiff explains reimbursement of single RAMESES check at a dentist office. Plaintiff was without available checks at the time and duly reimbursed RAMESES SCHOOL.

Similar blanket statements on reply brief are equally unpersuasive in the face of the detailed evidence.

Hence, the Court is constrained to hold on the entire record in this case that, on account of proscribed private benefit, petitioner was not operated exclusively for exempt purposes

within the meaning of section 501(c)(3).  Petitioner's tax-exempt status is properly revoked.

The Court has considered all other arguments made by the parties and, to the extent not specifically addressed herein, has concluded that they are without merit or are moot.  To reflect the foregoing,

<u>Decision will be entered for respondent</u>.